ALBERT WINNICK, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

IDA WINNICK, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 23478, 23479. Promulgated March 31, 1954.

*George L. Cassidy, Esq.,* and *William C. Loud, Esq.,* for the petitioners.

*Charles Speed Gray, Esq.,* and *Robert J. Fetterman, Esq.,* for the respondent.

1032

1034

SUPPLEMENTAL OPINION.

ARUNDELL, *Judge:* This proceeding involves deficiencies resulting from the respondent's determination that the profits from the sales of 50 houses built in 1943 and 1944 were ordinary income and not long-term capital gains as contended by petitioner.

Petitioners appealed to the United States Court of Appeals for the Sixth Circuit and the court set aside our determination and remanded the case to us for additional findings of fact to point up the original intention of the petitioners in building or acquiring the houses here in controversy.

We have received additional evidence directed to the questions propounded by the Court of Appeals. The supplemental findings confirm the conclusion and the result of our prior decision. We are convinced, particularly by the supplemental findings, that the original intention of the petitioners in building and acquiring the 50 houses involved here was to hold them for sale in the ordinary course of business and not for investment.

Petitioners' case rests largely on the fact that these houses were built pursuant to wartime regulations and restrictions which required them to hold the properties for rental to defense workers. They contend that, in agreeing to abide by these regulations and restrictions, they showed clearly an intent to hold these houses for the investment income provided by rental payments and not for sale purposes.

As we said in our prior opinion, we do not challenge the good faith of petitioners in building these houses with priorities granted to construct rental housing. There is nothing in this record to indicate that petitioners did not comply with the regulations under which the priorities were granted. However, these regulations did not proscribe sales of these houses in all instances. We take judicial notice of the principal regulation here involved, General Order 60–2 of the National Housing Agency, 24 C. F. R., sec. 702.4 (Cum. Supp.). We note, for example, that this regulation permitted sales of these defense housing units to eligible war workers after 4 months' occupancy.

The regulations do not appear to have inhibited seriously the petitioners in selling the houses. A total of 66 defense housing units on 4 different tracts were built or acquired by petitioners in 1943 and 1944. More than one-half of the 66 were sold before the restrictions imposed by General Order 60–2, *supra*, were lifted on October 15, 1945. Twenty-two of the 50 houses here in issue were sold prior to that date. We think that this concentration of sales indicates an intention to dispose of these houses as rapidly as circumstances would permit and refutes petitioners' contention that these housing units were being held primarily for investment purposes.

Moreover, our conclusion is strengthened when we look at the overall pattern of petitioners' business in the years preceding 1943, in the period contemporaneous with the building of these defense housing units and in the years subsequent to 1945. Prior to the war, petitioners constructed houses only for sale on completion. During the war years, at the same time that they were building, renting, or selling the defense housing units, they built an additional 21 houses for sale on completion. And, in 1946, and subsequent years they continued to build houses primarily for sale on completion. Considering together the sales of defense housing units and the sales of other houses built during these years, petitioners sold 10 houses in 1943, 25 in 1944, 35 in 1945, and 28 in 1946. This pattern is quite consistent with the conclusion that petitioners engaged primarily in the business of constructing houses for sale and not for investment purposes. Finally, in each of the 2 years in controversy, 1945 and 1946, petitioners' income from sales exceeded by a considerable margin their income from rentals. In 1945, rental income was less than one-half the income from sales; in 1946 rental income was less than one-fourth the income from sales. Cf. *Walter R. Crabtree*, 20 T. C. 841.

Our prior decision in this case turned on our conclusion that at the time the 50 houses involved were sold, they were held primarily for sale to customers in the ordinary course of petitioners' business. We said that the intention of the petitioners at the time the houses were built did not unalterably control their tax status at the time of their disposition, and that the crucial criterion was the purpose for which the properties were held at the time they were sold. (See *Carl Marks & Co.*, 12 T. C. 1196.) However, in the light of the additional evidence we have, we conclude that at no time were these houses held for investment purposes. Without participating in the defense housing program and without the aid of the priorities thereby obtained, petitioners' construction business would have been severely cut back during the war years. In addition to this very practical reason for building these houses, there were financial inducements. Liberal mortgages covering the complete cost of the houses and the land, plus the normal builder's profit of 10 per cent, were available to petitioners for building these units. Consequently, they were not required to tie up their own capital in this construction. They were also able to receive a modest income from the rental of these houses while restrictions prevented their sale. Meanwhile, the tenants were contributing toward the reduction of the mortgage indebtedness and increasing petitioners' equity in the houses which would be ultimately realized when the houses were sold.

Having concluded that the 50 houses here in controversy were held at all times primarily for sale in the ordinary course of petitioners'

business, it follows that the gains from their sales were ordinary income taxable under section 22 (a) of the Internal Revenue Code and not entitled to capital gains treatment under section 117 (j). It is unnecessary for us to follow the proceeds of the sales of the 50 houses further because of the foregoing conclusion. From the evidence in the record, it is impossible for us to trace the proceeds with precision. It is apparent, however, that the principal source of the funds which financed the apartment house was a mortgage in the amount of $35,250 granted in July 1946. At the time application for this loan was made, all but one of the houses here involved had been sold. The only expenditure for the construction of the apartment house shown to have been made prior to the date of the application for the loan was the $3,000 for the 3 lots on which the apartment was ultimately built.

Petitioners have raised here a question concerning the appropriate basis for determining the gain from the sales of 21 of the houses [3] which were transferred to Albert Winnick when Alwin, Inc., was dissolved on December 15, 1944. Petitioners elected to treat the dissolution under section 112 (b) (7) [4] of the Internal Revenue Code. After an audit of their returns for 1944, petitioners were found to have realized an ordinary dividend in the amount of $5,956.53. The audit

---

[3] Petitioner Winnick actually received 22 houses upon the dissolution of Alwin, but one is not involved in this case.

[4] SEC. 112. RECOGNITION OF GAIN OR LOSS.

(a) GENERAL RULE.—Upon the sale or exchange of property the entire amount of the gain or loss, determined under section 111, shall be recognized, except as hereinafter provided in this section.

(b) EXCHANGES SOLELY IN KIND.—

\* \* \* \* \* \* \*

(7) ELECTION AS TO RECOGNITION OF GAIN IN CERTAIN CORPORATE LIQUIDATIONS.—

(A) General Rule.—In the case of property distributed in complete liquidation of a domestic corporation, if—

(i) the liquidation is made in pursuance of a plan of liquidation adopted after December 31, 1950, whether the taxable year of the corporation began on, before, or after January 1, 1951; and

(ii) the distribution is in complete cancellation or redemption of all the stock, and the transfer of all the property under the liquidation occurs within some one calendar month in 1951 or 1952—

then in the case of each qualified electing shareholder (as defined in subparagraph (C)) gain upon the shares owned by him at the time of the adoption of the plan of liquidation shall be recognized only to the extent provided in subparagraphs (E) and (F).

\* \* \* \* \* \* \*

(E) Noncorporate Shareholders.—In the case of a qualified electing shareholder other than a corporation—

(i) There shall be recognized, and taxed as a dividend, so much of the gain as is not in excess of his ratable share of the earnings and profits of the corporation accumulated after February 28, 1913, such earnings and profits to be determined as of the close of the month in which the transfer in liquidation occurred under subparagraph (A) (ii), but without diminution by reason of distributions made during such month; but by including in the computation thereof all amounts accrued up to the date on which the transfer of all the property under the liquidation is completed; and

(ii) There shall be recognized, and taxed as short-term or long-term capital gain, as the case may be, so much of the remainder of the gain as is not in excess of the amount by which the value of that portion of the assets received by him which consists of money, or of stock or securities acquired by the corporation after August 15, 1950, exceeds his ratable share of such earnings and profits.

occurred in April 1947 after the returns for 1946 had been filed. The deficiency resulting from the determination made in the audit was agreed to and paid by petitioners.

It is now petitioners' contention that, irrespective of whether we determine that the gain from the sales of the 21 houses was ordinary income or a capital gain, they are entitled to compute their gain on an adjusted cost basis which will allow for the dividend on which they have been taxed, and for the unsecured liabilities which they assumed when they received these houses. This position is founded on the provisions of section 113 (a) (18) [5] of the Code which provides a special formula for the determination of an adjusted cost basis for property received upon dissolution under the provisions of section 112 (b) (7). Section 113 (a) (18) provides that when property has been transferred in cancellation of stock with respect to which gain has been recognized under the provisions of section 112 (b) (7), the adjusted basis of the property shall be the same as the basis of the stock which was canceled or redeemed, decreased in the amount of any money received, and increased in the amount of gain recognized.

We think that there is merit to the petitioners' argument on this issue. The respondent, while cooperating in the stipulation of the necessary facts to enable the determination of an adjusted basis for the 21 houses involved, nevertheless objects to the consideration of this issue on the grounds that it is beyond the scope of the mandate to this Court from the Court of Appeals for the Sixth Circuit. We disagree. We think that this issue is within the scope of the mandate and relevant to the disposition of the central question in the controversy. Accordingly, we have received additional evidence concerning the cost of the 21 houses affected, the depreciation allowed on them, mortgage balances at the time of their transfer to Winnick, and other relevant data to permit effect to be given to petitioners' claim for an adjusted basis for determining the gain from the disposition of these houses in a computation under Rule 50, and also to allow for an additional deduction for depreciation in the year 1945.

*Decision will be entered under Rule 50.*

---

[5] SEC. 113. ADJUSTED BASIS FOR DETERMINING GAIN OR LOSS.

(a) BASIS (UNADJUSTED) OF PROPERTY.—The basis of property shall be the cost of such property; except that—

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

(18) PROPERTY RECEIVED IN CERTAIN CORPORATE LIQUIDATIONS.—If the property was acquired by a shareholder in the liquidation of a corporation in cancellation or redemption of stock with respect to which gain was realized, but with respect to which, as the result of an election made by him under paragraph (7) of section 112 (b) of this Chapter (whether before or after its amendment by any revenue act) or of the Revenue Act of 1938, 52 Stat. 487, the extent to which gain was recognized was determined under such paragraph, then the basis shall be the same as the basis of such stock cancelled or redeemed in the liquidation, decreased in the amount of any money received by him, and increased in the amount of gain recognized to him.